FILED

2008 Jun-17  PM 12:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | |
|---|---|
| **GARY CHAPMAN, DEMETRIUS HARVEY, and MARCELLUS JACKSON,** | ) ) ) ) |
| **Plaintiffs,** | ) **Case No.: 1:06-CV-1972-VEH** |
| | ) |
| **v.** | ) |
| | ) |
| **IMERYS CARBONATES, LLC,** | ) |
| | ) |
| **Defendant.** | ) |

---

## <u>MEMORANDUM OPINION</u>

Before the court are the motions of the Defendant, Imerys Carbonates, LLC ("Defendant"), for summary judgment as to the claims of the Plaintiffs, Gary Chapman, Demetrius Harvey, and Marcellus Jackson, filed on December 19, 2007. (docs. 27-29, respectively).  For the reasons explained, the motions are due to be **GRANTED** as to all the claims of Gary Chapman and Demetrius Harvey, and **GRANTED in part and DENIED in part** as to the claims of Marcellus Jackson.

## I.   FACTUAL HISTORY[1]

Defendant operates a quarry facility in Sylacauga, Alabama, where it mines and processes calcium carbonate.  (Tribble Decl. ¶ 2).  Gary Chapman ("Chapman"), Demetrius Harvey ("Harvey"), and Marcellus Jackson ("Jackson") (referred to collectively as "Plaintiffs") are black males who are employed by Defendant as heavy equipment quarry operators.  (Persons Decl. ¶¶ 3-6).

Defendant's Quarry Operators are classified as A Operators, B Operators, and C Operators.  (Tribble Decl. ¶ 4).  Quarry Operators advance from C Operator to B Operator and then to A Operator, the highest-level operator position in the quarry beneath supervisory and management positions.  (*Id.* ¶ 4; Chapman Dep. pg. 107).  At the time of this action, Chapman worked as an A Operator, Jackson was a B Operator, and Harvey a C Operator.  (Tribble Decl. ¶¶ 11, 12; Persons Decl. ¶¶ 3-6).

---

[1]  These are the facts for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as "facts" in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts'") (citation omitted).  Facts are undisputed unless otherwise noted.  Where the facts are in dispute, they are stated in the manner most favorable to the plaintiff.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

The court notes that its ordinary preference is to refer to "Admitted Facts" designated by the parties on a motion for summary judgment.  Because the court herein decides three motions, with three separate sets of admitted facts, references to undisputed facts are made directly to the record and not to the parties' "Admitted Facts."

## II.   PROCEDURAL HISTORY

Plaintiffs filed an EEOC charge of race discrimination against Defendant on April 19, 2005.  (Chapman Dep. exh. 20; Harvey Dep. exh. 33).[2]  The EEOC issued a Dismissal and Notice of Rights to Plaintiffs on July 5, 2006.  (Jackson Dep. exh. 11).   Plaintiffs filed their Complaint in this action on September 29, 2006 (doc. 1), alleging race discrimination, retaliation, and hostile work environment in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §§ 2000 *et seq.* ("Title VII").[3]

Defendant filed its Answer on November 20, 2006.  (doc. 4).  On December 19, 2007, Defendant filed the pending motions for summary judgment as to each Plaintiff's claims.  (docs. 27-29).

## III.   STANDARD OF REVIEW

Summary judgment is proper only when there is no genuine issue of material

---

[2]  Plaintiffs together filed one EEOC charge.

[3]  The Eleventh Circuit Court has instructed that claims brought under 42 U.S.C. §§ 1981 and 1983 are analyzed under the same framework as Title VII disparate treatment claims. *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985) ("Where, as here, a plaintiff predicates liability under Title VII on disparate treatment and also claims liability under sections 1981 and 1983, the legal elements of the claims are identical.  *Lincoln v. Board of Regents*, 697 F.2d 928, 939 (11th Cir.1983)*, cert. denied*, 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983)*.* A plaintiff asserting either claim must prove intentional discrimination.  *Id.*  Therefore, we need not discuss plaintiff's Title VII claims separately from his section 1981 and section 1983 claims.").

fact and the moving party is entitled to judgment as a matter of law. FED. R .CIV. P. 56(c). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was based on intentional discrimination. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-12, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984). Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), as modified by *Desert Palace v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), that allocation scheme applies only in cases where there is no direct evidence of discrimination. *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).

4

Under the *McDonnell Douglas/Burdine* scheme, a plaintiff first has the burden of proving by a preponderance of evidence a *prima facie* case of discrimination. Once the plaintiff proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Finally, if the defendant carries its burden, the plaintiff must *either* prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment action, even though defendant's legitimate reason may also be true or have played some role in the decision. *McDonnell Douglas Corp.*, 411 U.S. at 802-05, 93 S.Ct. at 1824-27; *Burdine*, 450 U.S. at 252-54, 101 S.Ct. at 1093-95; *Desert Palace*, 539 U.S. at 101-02, 123 S.Ct. at 2155-56.

## IV.   ANALYSIS

### A.   Gary Chapman

Chapman entered employment with Defendant on October 8, 1993. (Persons Decl. ¶ 6). He has worked under the supervision of Aaron Tribble, Quarry Supervisor, since 1997. (Tribble Decl. ¶ 2). He was promoted to various positions before becoming an A Operator on April 14, 2003. (Persons Decl. ¶ 6).

#### 1.   Disparate Treatment

5

Chapman first claims he has suffered disparate treatment based on his race.

To establish a prima facie case of disparate treatment with circumstantial evidence, Chapman must satisfy the inferential test established by the Supreme Court in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Chapman must demonstrate that (1) he belongs to a racial minority; (2) he is subjected to an adverse employment action; (3) Defendant treats him less favorably than similarly situated employees outside his classification; and (4) he is qualified to perform his job. *Merriweather v. Alabama Dept. of Public Safety*, 17 F.Supp.2d 1260, 1267 (M.D.Ala. 1998), *aff'd*, 199 F.3d 443 (11th Cir. 1999), *citing Jones v. Carraway Medical Ctr.*, 137 F.3d 1306, 1310 (11th Cir. 1998), *superceded in non-relevant part on denial of reh'g*, 151 F.3d 1321 (11th Cir. 1998). *See also McDonnell-Douglas v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

Chapman alleges that he suffers disparate treatment because Defendant refuses to train him and promote him to advanced positions. Chapman also claims he was unfairly reprimanded for workplace accidents for which white employees were not disciplined.

### a.    Discipline

During his first month as an A Operator, Chapman suffered an accident with

Defendant's equipment, for which he received a notice of "Performance Failure." (Chapman Dep. exh. 16).  During the next fifteen months, he suffered three more accidents, each of which caused "considerable" damage to Defendant's equipment. (*Id.* exhs. 15-18).[4]   Chapman alleges that his two Performance Failures and suspension support his disparate treatment claim.

There is no dispute that Chapman belongs to a protected class based on his race, or that he is qualified to perform his job.  The only dispute concerns whether Chapman has alleged an adverse employment action and whether a similarly situated white comparator was treated more favorably than Chapman.

As to his Performance Failures, the court agrees that Chapman has not demonstrated an adverse employment action.  "An employment action is considered 'adverse' only if it results in some tangible, negative effect on the plaintiff's employment." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001), citing *Davis v. Town of Lake Park*, 245 F.3d 1232, 1241 (11th Cir. 2001).  Thus,

> to prove adverse employment action in a case under Title VII's antidiscrimination clause, an employee must show a *serious and*

---

[4]  Chapman received another Performance Failure after his second accident.  (Chapman Dep. exh. 16).  Following his third accident, which Chapman does not cite as evidence of race discrimination, he received a verbal warning.  (*Id.* exh. 17).  The fourth accident, which caused a $60,000 economic loss to Defendant, resulted in a three-day unpaid suspension.  (*Id.* exh. 18). Chapman filed a grievance following this suspension.  (*Id.* exh. 19).  While Defendant maintained that Chapman was suspended for "just cause," it back paid him for the three days of missed work.  (Chapman Dep. pp. 59, 89).

*material* change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances. . . .

*Davis*, 245 F.3d at 1239 (emphasis in original).

Chapman admits that a Performance Failure is not a formal step in Defendant's discipline procedure, and that it does not affect the terms or conditions of his employment. (Barker Decl. ¶ 10). Chapman does not argue or offer evidence to prove that he suffered a reduction in pay or benefits as a result of the Performance Failures. The record does not indicate that the Performance Failures had any effect on his employment. Chapman does not dispute that the Performance Failure is merely a "coaching tool" designed to motivate employees to be more careful with Defendant's equipment. (*Id.*).

Even if Chapman could show that the Performance Failures are an adverse action, he has not pointed to a similarly situated comparator who was treated more favorably following an accident.

Defendant issues Performance Failures to employees who engage in <u>avoidable</u> accidents. (Tribble Decl. ¶¶ 14, 15, 20; Chapman Dep. exh. 15). Chapman does not dispute that all four of his accidents were avoidable. He also does not identify a single white employee who engaged in an avoidable accident without receiving a

Performance Failure.[5]

As to his suspension, Defendant argues that, because it back-paid him for the suspension and gave him a verbal warning instead of a final written warning, the suspension was not an adverse action.  It cites to *Shelby v. Am. Colloid Co.*, 2005 WL 3804725, 4-6 (M.D. Ala. 2005) and *Lindsey v. Burlington N. Santa Fe Ry. Co.*, 266 F. Supp. 2d 1338, 1341, 1344 (N.D. Ala. 2003), *aff'd*, *Lindsey v. Burlington Northern Santa Fe*, 99 Fed.Appx. 886 (11th Cir. 2004), for the proposition that an employee who is back paid for days suspended from work cannot demonstrate an adverse action to support a disparate treatment claim.

Chapman responds that these cases are not controlling upon this court, nor are they accurate representations of the law, citing to *Burlington Northern & Santa Fe. Ry Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).  In *Burlington Northern*, the Supreme Court explained that

> [n]either do we find convincing any claim of insufficient evidence
> [that the Plaintiff suffered an adverse action based on her

---

[5]  At least one white employee, Gary Varner, has also received a Performance Failure following an accident.  (*Id.* ¶ 17).  While both Chapman and Varner engaged in apparently avoidable accidents and received Performance Failures, Chapman does not explain why Varner's was based on his job performance while Chapman's were based on his race.

Chapman points to Kevin Varner, Crockett Wyatt, Tom Ledin, and Gary Varner as similarly situated employees who were not disciplined following accidents.  He does not explain whether their accidents were avoidable, and does not refute Defendant's evidence that the accidents were, in fact, unavoidable.  (Tribble Decl. ¶¶ 15, 20).

> suspension].  [Plaintiff] did receive back pay [for her days of missed work]. But [Plaintiff] and her family had to live for 37 days without income.  They did not know during that time whether or when [Plaintiff] could return to work. Many reasonable employees would find a month without a pay check to be a serious financial hardship.

*Burlington Northern*, 548 U.S. at 72, 126 S.Ct. at 2417.

The court acknowledges and accepts Defendant's argument that *Burlington Northern* is not applicable to Chapman's disparate treatment claim because that case was decided in the context of a retaliation claim rather than discrimination. Nevertheless, since the parties submitted their briefs and evidence on this issue, the Eleventh Circuit has decided *Crawford v. Carroll*, 2008 WL 2246677 (11th Cir. 2008), in which the court clarified the law of this circuit as to what a plaintiff must prove to demonstrate an adverse employment action on a disparate treatment claim. Specifically, the Eleventh Circuit highlighted its prior decision in *Gillis v. Georgia Department of Corrections*, 400 F.3d 883 (11th Cir.2005), in which it found that "a poor performance evaluation that directly results in the denial of a pay raise of any significance clearly affects an employee's compensation and thus constitutes an adverse employment action under Title VII." *Crawford*, 2008 WL 2246677 at * 7, discussing *Gillis*, 400 F.3d at 888.

While both *Crawford* and *Gillis* address the denial of pay increases, not unpaid

suspensions, this court is bound by the reasoning of those decisions to reach a similar conclusion here.  Indeed, "actions [by an employer] that affect compensation are considered adverse employment actions."  *Gillis*, 400 F.3d at 887.  Although Chapman was later back-paid for the suspension, just as in *Crawford* where the merit increase was applied retroactively, the remedial action taken by Defendant "could not alter the fact that [Chapman had been denied his compensation for three days] or erase all injury associated with it, specifically the lost value and use of the funds during the time [he] was not receiving them." *Crawford*, 2008 WL 2246677 at * 7. Similar to *Crawford*, Chapman has demonstrated an adverse employment action to support his disparate treatment claim.[6]

Chapman's claim still fails, however, because he has not pointed to a white, similarly situated comparator.

In *Silvera v. Orange County School Bd.*, the Eleventh Circuit explained that

> [i]n determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways. . . . In order to satisfy the similar offenses prong, the comparator's misconduct must be nearly identical to

---

[6]  The court reaches this conclusion despite the contrary authority cited by Defendant *supra*.  Those cases were decided before *Crawford* and are, in any event, not binding on this court.

the plaintiff's in order "to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."

244 F.3d 1253, 1259 (11th Cir. 2001), quoting *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir. 1998), *opinion modified by* 151 F.3d 1321 (11th Cir.1998). *See also Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997); *Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir.1999).

In *Maniccia*, the Eleventh Circuit instructed that

[i]n evaluating whether employees are similarly situated for purposes of establishing a prima facie case of disparate treatment, . . . [t]he most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishment imposed. . . . We require that the quantity and quality of the comparator's misconduct be nearly identical. . . .

171 F.3d at 1368.

Chapman does not dispute that he was suspended only <u>after</u> he suffered four accidents in fifteen months, the last of which alone resulted in $60,000 in economic loss to Defendant. (Chapman Dep. exh. 18). Chapman points to no other employee, of any race, who engaged in as many accidents in a similarly short length of time, or who suffered even a single accident nearly as costly to Defendant as his final, $60,000 accident.

Chapman does identify four white Quarry Operators – Gary Varner, Kevin Varner, Crockett Wyatt, and Tom Ledin – and attempts to argue that they are

comparators.   However, Chapman admits that he did not witness any of their accidents and does not know whether their accidents are comparable to his. (Chapman Dep. pg. 58).  Although he argues that they avoided discipline because they are white, he refused to testify to this at his deposition, saying only that he did not know why they were not disciplined.  (*Id.*).[7]

Finally, Chapman alleges that he was subjected to drug testing after his accidents while white employees were not. (Compl. ¶ 11).  The only point of dispute about this claim is, again, whether Chapman can prove that similarly situated white employees were not tested after an accident.  While Chapman argues that he can, the record does not support this contention, as white employees have submitted to drug tests following accidents.  (Ledin Dep. pg. 110 (Ledin); Averette Dep. pp. 69-70 (Kevin Varner)).  Further, Chapman does not point to any evidence that any white employee was not tested after an accident.

The court, therefore, finds that Chapman has not presented a prima facie case of disparate treatment with respect to discipline.  Furthermore, while Chapman argues that Defendant's reason for disciplining him (i.e., his accidents) is a pretext for race

---

[7] Tom Ledin testified that "I have crashed trucks, caused all kind of damage to stuff. And people have been written up and sent home for things smaller than what I have done." (Ledin Dep. pg. 99).  Ledin's most costly accident described in the record caused $10,000-worth of damage to Defendant's railroad track.  (*Id.* pg. 107).  Compared to Chapman's accident history, the record hardly supports Ledin's (or Chapman's) belief that Chapman was punished more severely than Ledin "for things smaller than what [Ledin] ha[s] done."

13

discrimination, he presents neither argument nor evidence to carry his burden on this point.  Therefore, Defendant is entitled to summary judgment on this claim.

### b.    Promotions

### i.    Leader

"Leaders" are A Operators who, on occasion, perform additional duties to assist Defendant's two Quarry Supervisors.  (Barker Decl. ¶ 7).  Leader duties are assigned only to A Operators who demonstrate leadership qualities and a superior work ethic. (Tribble Decl. ¶ 9).  Leaders are neither supervisors nor managers, and have no authority to hire, fire, or otherwise affect the terms and conditions of their coworkers' employment.  (Barker Decl. ¶ 8).  A Operators who perform Leader duties are paid two dollars per hour more than their regular wage.[8]  At the time of this action, only two A Operators, Steve Harbin and Elton Datcher, performed Leader duties.  (Tribble Decl. ¶ 10). Harbin is white, and Datcher is black.  (*Id.*).

Chapman argues that he would like to become a Leader.  He alleges that Defendant has denied him the opportunity because he is black.

Defendant first challenges Chapman's assertion that his failure to become a

---

[8]  There is some dispute as to how much of an increase in pay a Leader receives. Chapman offers evidence that Leaders can earn approximately two dollars per hour above their regular wage (Pl's exh. 27), while Defendant avers that the increase is only one dollar (Tribble Decl. ¶ 8; Barker Decl. ¶ 7).  Because the court accepts Chapman's version of all disputed facts, it acknowledges, for purposes of summary judgment, that Leaders earn an extra $2.00 per hour above their A Operator wages.

Leader is an adverse employment action.  However, while Defendant argues that "Leader" is not a separate job position from A Operator (Tribble Decl. ¶ 9), the court acknowledges that Leaders have more job responsibilities than other A Operators and, therefore, earn more money.  (*Id.*).  Given that Defendant assigns Leader duties only to especially qualified A Operators, the court agrees that Chapman's failure to receive Leader duties is tantamount to a failure to receive a promotion.

Having found that Chapman has suffered an adverse employment action, however, the court cannot conclude that Chapman was qualified to become a Leader. Chapman offers no evidence that he possesses a superior work ethic or leadership skills compared with other A Operators.  (*See* Tribble Decl. ¶¶ 8, 10).  He argues that his qualifications are "uncontested" simply because he is an A Operator.  In response, Defendant points to Chapman's accident history and argues that he is an "unattractive" Leader candidate.[9]

---

[9]  Chapman seems to argue Steve Harbin became a Leader because he is white.  He points out that Harbin lives near Aaron Tribble and occasionally cuts Tribble's grass.  Chapman argues that this "good ole boy situation down [in the quarry]" is to blame for Harbin's being assigned Leader duties instead of Chapman.  Chapman does not explain how evidence of favoritism is probative of race discrimination.

Chapman also alleges that Defendant <u>temporarily</u> assigned Leader duties to David Holman, another white A Operator.  Chapman argues that this assignment was also race-based.  He apparently ignores Elton Datcher who, like Harbin, is <u>permanently</u> assigned Leader duties. (Tribble Decl. ¶ 10).  Chapman does not mention Datcher in his brief.

Chapman also fails to address why he believes his race prevents him from becoming a Leader when it clearly did not prevent him from being promoted to A Operator, a position for which

Having failed to demonstrate that he is qualified to be a Leader, Chapman has not presented a prima facie case of disparate treatment as to Leader duties. If he had, his claim would still fail because he offers no argument or evidence that his accident history is a pretext for race discrimination in failing to promote him to Leader.

ii.    Quarry Supervisor

Chapman also argues that Defendant discriminated against him by failing to promote him to Quarry Supervisor.

Chapman applied for the position in April 2005 after one of Defendant's three Quarry Supervisors announced his retirement.[10]   (Barker Decl. ¶ 9). Defendant received several applications from both white and black employees, but before it conducted any interviews, Defendant decided to operate the quarry without a third supervisor and never filled the position. (*Id.*). Defendant has since operated its quarry with only two supervisors. (*Id.*).

Without addressing the first two elements of his claim, Defendant argues that Chapman cannot prove that the Quarry Supervisor position was filled by a similarly situated white employee, because the position was not filled by anyone. Chapman

---

several white employees also applied before it was offered to Chapman. (Tribble Decl. ¶ 11).

[10]   The record is unclear whether Chapman actually applied for this position. Defendant presents evidence that he did not (Persons Decl. ¶ 14), while Chapman testified that he did (Chapman Dep. pg. 28). Therefore, the court accepts that Chapman applied for the position but was never offered it.

16

responds that he can prove this element by showing that Defendant chose not to fill the position "because a black was a likely candidate."

Even if he is correct in this argument, Chapman offers nothing more than speculation to prove that Defendant's decision was motivated by race discrimination. Moreover, it is undisputed that, in July 2005, just two months after Defendant eliminated the third position, one of the remaining two Quarry Supervisor positions became vacant and was filled by a black A Operator, Houston Wilson. (Barker Decl. ¶ 9). Therefore, Chapman's argument that race played a role in the elimination of the third position is highly suspect.[11]

While Defendant argues that it did not hire Chapman as a third Quarry Supervisor because it did not need to fill the position, Chapman has failed to show that this articulated reason is a pretext for discrimination.

### iii.    Blasting training

Chapman testified that he asked for training in "blasting" but was denied the opportunity because of his race. (Chapman Dep. pp. 106-07).

Defendant submits that this training is available to A Operators only upon

---

[11]  Chapman submits that Dave Jarvis, then a Quarry Supervisor and a selecting official for the third position, was "insensitive" toward "anything that's not white," and that Jarvis's racist sentiments could have influenced Defendant's decision to eliminate the position. Again, Chapman offers only speculation to support this claim.

request, and that Chapman never requested it. (Tribble Decl. ¶ 7). The court accepts that Chapman did request it. Nevertheless, Chapman alleges that he wanted the training "to advance [him]self in the mining department," despite <u>undisputed</u> evidence that he could not have used the training because blasting is not performed during his shift. Chapman does not argue or offer evidence that he ever attempted to change his shift so he could train for and perform blasting. Furthermore, if he was able to use the training, he would have earned no additional pay or benefits therefor. (*Id.*). Chapman also offers no evidence that, had he been trained for blasting, he would have been more qualified for advancement in the quarry, as Defendant offers "no training [ ] to A Operators that can enhance their chances of being assigned Leader duties." (*Id.* ¶ 9).

Chapman's failure to receive blasting training is not an adverse employment action, given that he has not suffered a materially adverse decision that affects his compensation, terms, conditions, or privileges of employment, or that deprived him of employment opportunities. *See Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000), quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3rd Cir. 1997). Chapman has not presented a prima facie case of race discrimination based on Defendant's failure to provide blasting training. Chapman does not argue that Defendant's reasons for not training him (i.e., that Chapman could not have used

18

the training) is a pretext for race discrimination.

### iv.   Overtime

Although he alleges in his Complaint that he has been denied overtime opportunities, Chapman testified that he obtains as much overtime as he wants and makes no argument regarding overtime in his opposition brief.  (Chapman Dep. pg. 109).

Because Chapman has failed to present a prima facie case of disparate treatment, or to demonstrate that Defendant's reasons for its conduct are a pretext for race discrimination, the court finds that Defendant is entitled to summary judgment on this claim.

### 2.   Retaliation[12]

In his Complaint, Chapman alleges that, after he complained to Defendant of race discrimination and filed an EEOC charge against it, Defendant retaliated by refusing to consider him for Quarry Supervisor or for Leader.

The Eleventh Circuit has recognized that retaliation is a separate violation of Title VII. *See Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 586 (11th Cir. 2000).

---

[12] Chapman offers no response to Defendant's motion on this claim.  Thus, the court considers this claim to be abandoned.  *See, e.g.*, *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned").  Even if Chapman had not abandoned the claim, however, it would not survive summary judgment as discussed *infra*.

"To recover for retaliation, the plaintiff need not prove the underlying claim of discrimination which led to [his] protest, so long as [he] had a reasonable good faith belief that the discrimination existed." *Id., quoting Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994), and *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989).

To establish a prima facie case of retaliation under Title VII, Chapman must show that: (1) he participated in a Title VII-protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action. *See Farley v. Nationwide Mut. Ins.*, 197 F.3d 1322, 1336 (11th Cir. 1999); *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir.2002); *Lucas v. Grainger, Inc.*, 257 F.3d 1249, 1260-61 (11th Cir.2001).

A. Leader

Defendant does not dispute that Chapman engaged in protected activity by complaining to it of race discrimination or filing his EEOC charge. Further, as stated *supra*, the court accepts that Defendant's refusal to assign Chapman Leader duties was an adverse employment.

However, the court cannot conclude that a causal connection exists between Chapman's protected activities and his failure to become a Leader.

The Eleventh Circuit has instructed that

> To prove a causal connection, we require a plaintiff only to demonstrate 'that the protected activity and the adverse action were not wholly unrelated.' We have plainly held that a plaintiff satisfies this element if he provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was a close temporal proximity between this awareness and the adverse [employment] action.

*Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1180 n. 30 (11th Cir. 2003), quoting

*Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir.1999).

With no further evidence of a causal connection, Chapman appears to rely solely on temporal proximity to establish this element of his claim. However, to the extent that he does so, he must demonstrate that the temporal proximity is "very close." *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 1511, 149 L.Ed.2d 509 (2001). "If there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law." *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (four-month gap between protected activity and adverse action insufficient to show "very close" temporal proximity).

It is not clear when Chapman complained to Defendant of race discrimination[13]

---

[13] Chapman's only documented grievance in the record is dated July 2004 and contains no allegation of race discrimination. (Chapman Dep. pg. 52, exh. 19). Although the court accepts that he did, in fact, complaint to Defendant of discrimination, Chapman offers no evidence of when he made these complaints.

or when it began to deny him Leader duties.  Thus, the court cannot determine whether, when it made the decision not to assign Leader duties to Chapman, Defendant was aware of Chapman's complaints against it, much less whether any degree of temporal proximity exists between the complaints and Defendant's decision.

As to his EEOC charge, it is clear that the charge was filed in April 2005. (Chapman Dep. exh. 20).  However, because Chapman does not explain when he was first refused Leader duties, the court cannot conclude that Defendant was aware of the charge when it refused to promote him to Leader, or that a "very close" temporal proximity is present between the two events.  Accordingly, Chapman has not demonstrated a causal connection between his protected activities and the adverse employment action.  Therefore, Chapman has failed to present a prima facie case of retaliation as to Leader duties.  He also offers <u>no</u> evidence that Defendant's articulated reason for refusing him Leader duties (his accident history) is a pretext for retaliation.

B.    Quarry Supervisor

Defendant argues that Chapman has failed to show an adverse employment action in connection with his application for Quarry Supervisor.  According to the Supreme Court,

> [t]he anti-retaliation provision [of Title VII] protects an individual not from all retaliation, but from retaliation that produces an injury or harm. [ ] In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, "which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Rochon*, 438 F.3d, at 1219 (*quoting Washington*, 420 F.3d, at 662).

*Burlington Northern*, 548 U.S. at 68, 126 S.Ct. at 2415.

It is, unarguably, not reasonable for an employee to forgo complaining of discrimination or filing an EEOC charge in fear that the employer would retaliate by eliminating a supervisory position in its workforce, change its organizational structure, and operate its facility without that position for several years thereafter. Chapman presents no argument or evidence to the contrary.

Furthermore, it is not clear whether Chapman filed his EEOC charge or complained to Defendant of race discrimination before Defendant eliminated the third Quarry Supervisor position. As stated *supra*, Chapman filed the EEOC charge on April 19, 2005 and complained to Defendant of discrimination on an unspecified date. (Chapman Dep. exh. 20). Defendant collected applications for the third Quarry Supervisor position between April 5 and April 10, 2005. (Barker Decl. ¶ 9; Persons Decl. ¶ 14). Defendant thereafter, on an unspecified date, decided not to fill the position. (Barker Decl. ¶ 9). It is possible that Defendant eliminated the position relatively soon after April 10, even before Chapman filed his EEOC charge or

complained internally of discrimination, particularly as it made the decision prior to conducting interviews. (*Id.*). Thus, Defendant may not have been aware of Chapman's protected activities when it declined to hire a third supervisor. Due to Chapman's failure to adduce evidence on this point, the court cannot conclude that a causal connection exists between the adverse action and Chapman's protected activities.

Accordingly, the court finds that Chapman has failed to present a prima facie case of retaliation related to his application for Quarry Supervisor. Chapman also fails to argue or present evidence that Defendant's articulated reason for failing to promote him (that it could operate its facility without a third supervisor, so it did not need to hire anyone for the position) is pretextual.

### C.   Retaliatory Discipline

Three years prior to this action, Chapman alleges that he confronted Aaron Tribble on a matter that is not disclosed in the record. (Chapman Dep. pg. 37). An argument later ensued about Tribble's distribution of work assignments to Chapman. (*Id.*). At the end of the argument, Chapman claims that Tribble "shoved" him. (*Id.*). Chapman filed a grievance against Tribble, a copy of which has not been presented to the court. Chapman did not claim in the grievance that race discrimination had

anything to do with his altercation with Tribble.[14]

Chapman alleges that "ever since [he filed the grievance about Tribble], no matter what bump or scratch that I do on a piece of equipment, I get wrote up for it. I've been sent home once for it.  There's been two different white guys have the same bumps or scratches on equipment that I have.  They haven't been sent home." (Chapman Dep. pg. 38).

Chapman's grievance against Tribble is not a protected activity.  To qualify as such, the grievance must have alleged that Tribble's conduct was racially motivated. *See Baker v. Bank of Nova Scotia*, 2006 WL 618413 (N.D.Ga. 2006); *Holiness v. Moore-Handley, Inc.*, 114 F.Supp.2d 1176 (N.D.Ala. 1999).

Furthermore, without discussing the second or third elements of Chapman's claim, Defendant has offered a legitimate, non-discriminatory reason for disciplining Chapman.  As explained *supra*, Chapman was disciplined for multiple avoidable accidents.  To the extent Chapman argues that this reason is a pretext for retaliation, the court disagrees.  Chapman complains that he was disciplined for causing "bumps" and "scratches" on Defendant's equipment.  The court can only assume that, by "bump or scratch," Chapman is referring to his four accidents. (Chapman Dep. exhs.

---

[14]  Chapman later admitted that he has never filed a grievance alleging race discrimination.  (Chapman Dep. pp. 81-82).

15-18).  However, the court is hardly persuaded that an accident causing $60,000 in economic loss – the final accident for which he claims he was "sent home" – is a mere "bump or scratch."  (*Id.*, exh. 18).  As discussed *supra*, the court also finds no evidence of "two different white guys" who engaged in similar conduct without being disciplined.

Because Chapman has not presented a prima facie case of retaliation or offered argument or evidence to demonstrate pretext, Defendant is entitled to summary judgment on this claim.

        3.     Hostile Work Environment

A claim of hostile work environment is established under Title VII upon proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993).

To prevail on this claim, Chapman must present sufficient evidence to show that: (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his race; (4) the harassment was sufficiently severe and pervasive to alter the terms and conditions of his employment and create an abusive working environment; and (5) Defendant is responsible for such

environment under either a theory of vicarious or direct liability. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002); *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999).

Chapman's claim is based on the following events:

1.    Aaron Tribble shoved him during an argument about Chapman's work assignments. (Chapman Dep. pg. 37-38).  This incident occurred once three years prior to this action and included no reference to race. (*Id.* pg. 36-38; Jackson Dep. pg. 145).

2.    Chapman heard "whispering" from "five or six" coworkers, both white and black, that Tribble was threatening to "whip [his] ass," supposedly for complaining about their above-described argument. (*Id.* pp. 112, 116).  It is unclear how many times Chapman heard this whispering.  The threat did not refer to race. Although Chapman has worked for Defendant for more than a decade and claims that "generally everybody know Gary," he could not identify a single coworker who told him of the threat. (*Id.*).  Tribble never made the threat to Chapman directly. (*Id.* pg. 124-25).  Chapman offers no evidence that Tribble ever actually made the threat.

3.    Chapman twice heard Tribble "say something to Marcellus Jackson about hanging him with a rope from a tree" over a CB radio.  (Chapman Dep. pg. 39). It is unclear when these statements were made.

27

4.    Tribble often refused to speak with Chapman and communicated Chapman's work assignments to him through David Holman, a white A Operator/Leader.  (*Id.* pp. 35-36).

5.    Travis Barrand, a C Operator for Defendant, testified that Steve Harbin is "openly hostile" toward minorities.  (Barrand Dep. pg. 27).  Chapman also submits the depositions of other white Quarry Operators, including Kevin Varner, Tom Ledin, and Frank Averette, who testified to "differences in treatment" between Defendant's black and white employees.

Defendant does not dispute that Chapman belongs to a protected group or that he felt subjected to unwelcome harassment based on the conduct described *supra*. Defendant argues that much of the alleged harassment was not based on race.  The statements and conduct must be of a racial nature "before they are considered in determining whether the severe or pervasive requirement is met." *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000).  "Innocuous statements or conduct, or boorish ones that do not relate to the [race] of the actor or of the offended party, . . . are not counted." *Id.*  Because only Tribble's "rope" comment and the testimonies of Chapman's coworkers (# 5, *supra*) suggest conduct that is even implicitly based on race, the court will not consider any of the other alleged conduct in the remainder of its analysis. *See Id.*

The Eleventh Circuit has instructed that

[e]stablishing that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component. The employee must "subjectively perceive" the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable. . . . "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'"

*Mendoza*, 195 F.3d at 1246, *quoting Harris*, 510 U.S. at 21-22, 114 S.Ct. 367; *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 118 S.Ct. 998, 1003, 140 L.E.2d 201 (1998).

To determine whether the harassment objectively altered the terms or conditions of Chapman's employment, the court must consider: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating; and (4) whether the conduct unreasonably interferes with Chapman's job performance. *Mendoza*, 195 F.3d at 1246, *citing Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 647 (11th Cir. 1997), and *Harris*, 510 U.S. at 23, 114 S.Ct. at 371.

Turning first to the statements offered by witnesses other than Chapman which, according to Chapman, is probative of "differences in treatment" between Defendant's white and black employees, it is undisputed that Chapman was not

29

present when the statements were made.  Chapman has no personal knowledge of them except as communicated to him secondhand.[15]  Thus, the circumstances under which the statements were made make it difficult to characterize them as objectively severe.  *Primas v. Board of Regents of the University System of Georgia*, 2006 WL 839242, * 7 (M.D.Ga. 2006); *Reeves v. C.H. Robinson Worldwide, Inc.*, 2008 WL 1848882, * 6 (11th Cir. 2008) (applying analysis to gender-based hostile work environment claim).

None of the instances were physically threatening to Chapman.[16]  Finally, Chapman argues that his job performance has been affected by the harassment, but he testified only that it made him "uncomfortable" and unable "to relax" at work. (Chapman Dep. pp. 112-13).

---

[15]  For example, when asked what Tom Ledin would testify to at his deposition, Chapman answered that "[h]e pretty much told me he knows there's a difference between the black and the whites because of some statements that was made to him by Steve Harbin and other employees." (Chapman Dep. pp. 132-33).  Chapman admits that he did not hear these statements himself, testifying that "I can only tell you what [Ledin] told me."  (*Id.* pg. 133).

Chapman later detailed the events as described by Ledin, of which there were only two:  (1) he "was told" that Harbin "basically said that he'd like to whip Demetrius [Harvey's] little black ass," and (2) Harbin provoked an altercation with an unidentified black employee "about a statement that was made about the union."  (*Id.* pg. 72).

[16]  The court acknowledges that some of the alleged conduct (Tribble's shoving Chapman and threatening him with additional violence) was physically threatening to Chapman.  Because neither of these events appears to have been based on Chapman's race – Chapman testified that Tribble's conduct might have been based on his race or simply personal dislike (Chapman Dep. pg. 125) – that evidence is not probative of racial harassment.

Only Tribble's "rope" comment survives as evidence of racial harassment. As stated *supra*, however, it is unclear when, during Chapman's fifteen-year employment with Defendant, this statement was made. (Chapman Dep. pg. 39). Nevertheless, the court cannot conclude that one arguably race-based statement[17] made in Chapman's presence establishes that he suffers from a racially hostile work environment.

Neither the frequency nor the severity of the comment rises to the level of "severe or pervasiveness" necessary to support this claim. While offensive and arguably severe in its content, the statement was made only once over a CB radio outside Chapman's presence. Chapman concedes that he did not report the comment to Defendant because "it was not directed at [him]." (Chapman Dep. pg. 64). Aside from a few vague statements at his deposition, Chapman offers no evidence that the comment interfered with his job performance.[18]

---

[17] Given the multitude of witnesses, both white and black, who testified that they understood the statement to refer to "the slavery days," the court accepts for purposes of summary judgment that the statement is implicitly race-based. (Chapman Dep. pg. 39; Jackson Dep. pg. 29; Harvey Dep. pg. 138; Averette Dep. pg. 107; Ledin Dep. pp. 124-25; Kevin Varner Dep. pp. 60-61). *See Reeves*, 2008 WL 1848882 at * 4 (conduct may be based on a protected characteristic even if it is not directed at the plaintiff).

[18] Even if the harassment was severe and pervasive, Chapman has failed to establish a basis for holding Defendant liable for the acts of Tribble. Chapman did not complain to Defendant about Tribble's "rope" comment and, as to the conduct of which he did complain, he does not know whether Tribble was ever disciplined for it. (Chapman Dep. pg. 101-102). Thus, Chapman's claim that Defendant should be liable for Tribble's conduct is apparently based on his speculation that Defendant did not take corrective action in response to his complaint, despite the lack of evidence that Tribble continued harassing him after he reported the conduct.

For the reasons explained, the court concludes that Defendant is entitled to summary judgment as to all claims asserted by Plaintiff Gary Chapman.  The court now turns to the claims of Plaintiff Marcellus Jackson.

B.   Marcellus Jackson

Jackson entered employment with Defendant on August 29, 1996.  (Persons Decl. ¶ 4).  He also works under the supervision of Aaron Tribble.  (Tribble Decl. ¶ 2).  Jackson worked in various positions before being promoted to B Operator on September 16, 2005.  (Persons Decl. ¶¶ 4, 5).

1.   Disparate Treatment

Jackson alleges that he has suffered disparate treatment because Defendant has denied him "upgrade work" and promotions to Leader and Quarry Supervisor.  He also claims he has been subject to discriminatory discipline.

a.   Promotions

i.   Quarry Supervisor

Jackson first argues that he was denied a promotion to Quarry Supervisor because he is black.[19]

_____

[19]  Similar to Chapman, there is some dispute in the record as to whether Jackson applied for the Quarry Supervisor position in April 2005.  At the summary judgment phase, however, the court accepts Jackson's version of events and assumes that he did submit an application for the position.

Defendant argues that, assuming Jackson has satisfied the first three elements of his prima facie case, he cannot establish the fourth element by demonstrating that the promotion was awarded to a similarly situated white comparator.  As stated *supra*, the position was never filled, thus prohibiting Jackson from arguing that anyone – white or black – was offered the promotion over him.

Jackson responds that Defendant's application of the law is "overly rigid," and that he may carry his burden by demonstrating that Defendant chose not to hire anyone "because a black was a likely candidate."  Notably absent from his brief, however, is any argument or evidence that Jackson or any other black candidate was a "likely" candidate.[20]  He also offers no evidence that race played a role in Defendant's decision to eliminate the third Quarry Supervisor position.

### ii.    Leader

Jackson also avers that he was wrongfully denied work as a Leader in the quarry.  He argues generally that Defendant's procedure for selecting Leaders is tainted by "extreme subjectivity and vagueness" because there are no objective

---

[20]  Jackson points out that Houston Wilson was promoted to Quarry Supervisor only after 40 years of employment with Defendant and after Plaintiffs filed their EEOC charges.  Jackson, therefore, argues that Wilson's promotion was a "window dressing" to obscure Defendant's racial animus.  The record is void of evidence to support this argument, which is negated by Jackson's promotion to B Operator by the same officials who promoted Wilson.  (*See* Tribble Decl. ¶ 12, (noting that three white quarry operators also applied for the position that was awarded to Jackson); Persons Decl. exh. 8)).

qualifications for the position, rendering the selection process "secretive" and "inevitably unfair," implying that Defendant's method of assigning Leader duties is a type of breeding ground for race discrimination.[21]

Jackson offers absolutely no basis in fact to support this argument, which is squarely contradicted by Defendant's requirement that all Leaders be A Operators who demonstrate leadership qualities and superior communication skills and work ethic.  (Tribble Decl. ¶ 8).  The record indicates that Jackson, like Chapman, lacked these qualifications to some degree, given his accident record, his history of cursing at coworkers, and his reputation for complaining.  (Jackson Dep. exhs. 1, 3, 6-8 (Disciplinary Action Forms for Marcellus Jackson)).  Jackson also fails to address the fact that he was clearly not qualified to become a Leader because he was not an A Operator.  (*See* Tribble Decl. ¶ 8 ("Throughout my tenure as a Quarry Supervisor, [Defendant] has assigned Leader duties to only A Operators")).  Jackson testified that he has no desire to become an A Operator because the job carries "too much responsibility."[22]  (Jackson Dep. pg. 52).  He offers no evidence of any Leader in the

---

[21]  Similar to Chapman's disparate treatment claim, Jackson apparently ignores that Elton Datcher became a permanent Leader in January 2006.  (Tribble Decl. ¶ 10).

[22]  It is not clear why Jackson desires to become a Leader but not an A Operator, as Leaders hold even greater responsibility than A Operators.  (*See* Tribble Decl. ¶ 8 (noting that Leaders perform A Operator duties in addition to directing other Quarry Operators in the absence of a Quarry Supervisor)).

quarry who was not also an A Operator.[23]

     iii. Upgrade work[24]

  Jackson next argues that he was wrongfully denied upgrade work because of his race.

  Defendant responds that Jackson was denied this work because he was not the most qualified B Operator to perform upgrade work.  Defendant points to Camron Ray ("Ray"), a white Quarry Operator who had been a B Operator for more than three years when Jackson took that position, and argues that it assigned Ray upgrade work more often than Jackson because Ray was more experienced and more skilled with A Operator equipment than Jackson.[25]  (Persons Decl. ¶ 7).  While Jackson disputes

  [23]  Jackson points to Steve Harbin, an A Operator and Leader, and questions whether he is qualified for Leader duties, but makes no reference to Harbin's actual qualifications or lack thereof.  Instead, Jackson accuses Tribble of assigning Leader duties to Harbin because the two were neighbors and "shared the same views" toward "all non-white races of people."  The only evidence Jackson offers to support this theory is the personal opinion of his coworker, Tom Ledin.  (Ledin Dep. pp. 72-74, 147, 160-62).  As Ledin is neither a Leader nor a supervisor in the quarry, Jackson fails to explain how Ledin's opinion is relevant to whether Harbin is qualified to be a Leader.

  [24]  On occasion, an insufficient number of A Operators are assigned to work in the quarry, thus allowing qualified B Operators to temporarily perform A Operators' duties in return for A Operators' pay.  (Tribble Decl. ¶ 6).  The same applies to C Operators in the absence of B and A Operators.  (*Id.*).

  [25]  Jackson misunderstands Defendant as arguing only that Ray was more qualified than Jackson to work with a shovel.  However, Defendant argues that Ray was more proficient than Jackson as a B Operator in general, to which Jackson offers no rebuttal.

The court also notes that one of Jackson's unpaid suspensions, discussed further *infra*, followed an avoidable accident that occurred while Jackson was performing upgrade work.  (Tribble Decl.

that Ray was more qualified than he, he offers no evidence that he was more (or even equally) qualified for upgrade work than Ray.

Instead, Jackson shifts his argument from whether he is the most qualified for upgrade work to whether Defendant divided upgrade work fairly between white and black B Operators. According to Jackson, Defendant equally divides upgrade work between white B Operators, but does not divide the work equally between a white B Operator and a black B Operator. The only evidence he offers on this point is a time sheet that reflects Camron Ray earning 223 hours of upgrade work versus Jackson's 27.5. (Pl's Exh. 22).

In light of Ray's additional experience and qualifications for upgrade work, Jackson has failed to demonstrate that Defendant's actual purpose in denying him upgrade work in favor of Ray was based on his race, and not his inferior qualifications. Jackson points to no white B Operator who was <u>equally</u> qualified for upgrade work as Jackson as a comparator and who received more upgrade work than Jackson.

As to promotions, Jackson has not presented a prima facie case of disparate

---

¶ 14; Jackson Dep. pg. 88). Defendant determined that the accident could have been avoided had Jackson exercised "proper care." (Tribble Decl. ¶ 14). Nevertheless, Defendant promoted Jackson to B Operator just six months later in September 2005. (*Id.*; Persons Decl. ¶ 4). It is difficult to reconcile Jackson's claim that his race prevents him from receiving upgrade work but it clearly did not prevent him from receiving it in the past or from being promoted to his current position.

treatment, nor has he demonstrated that Defendant's reasons for denying him promotions or upgrade work are a pretext for race discrimination.

        b.     Discipline

Jackson has been disciplined on several occasions during his 10-year employment with Defendant, including verbal and written warnings for excessive tardiness and absenteeism, twice for cursing at coworkers, and for engaging in avoidable accidents with Defendant's equipment. (Jackson Dep. exhs. 1, 3, 6-8).

Jackson claims he was subject to disparate discipline on three of these occasions: (1) a five-day suspension in November 2003 for cursing at his supervisor (*Id.*, exh. 1), and (2) two suspensions for causing damage to Defendant's equipment (*Id.*, exhs. 8-9; Jackson Dep. pg. 88; Varner Dep. pg. 97).

Regarding the first suspension, Jackson appears to allege that he justifiably cursed at a supervisor and was unfairly disciplined for it. According to Jackson, he was threatened by a white coworker, Chris Smith, who had commented over a CB radio that "if Marcellus is go in the woods, he ain't going to come out. I want to kill me a N." (Jackson Dep. pg. 34). Jackson reported the comment to Ray Benitez ("Benitez"), another Quarry Operator who was acting as Jackson's supervisor that night. (*Id.* pg. 35). Later that evening in Defendant's parking lot, Benitez approached Jackson, whereupon Jackson cursed at Benitez for refusing to respond to

his complaint about Smith.  (*Id.*).  The following morning, Jackson reported both Smith and Benitez to Defendant but, "incredibly," Defendant ignored his complaints and suspended him for cursing at Benitez.

Without addressing the first three elements of his claim, Defendant argues, and the court agrees, that Jackson has failed to identify a similarly situated white employee who was not suspended after cursing at a supervisor.[26] [27]

Jackson argues that his second suspension for a bulldozer accident in March 2005 was also discriminatory.  He argues he was unfairly suspended because white employees have engaged in similar accidents without being disciplined.

The accident occurred when he was operating a bulldozer to carve a ramp out of a wall inside the quarry.  (Jackson Dep. pp. 87-88; Varner Dep. pp. 97).  At some point, the wall began to cave in on top of Jackson's bulldozer, apparently causing damage to the bulldozer.  (*Id.* pg. 101).

Jackson does not dispute Defendant's description of the accident, and apparently concedes that the accident was avoidable.  Jackson argues that Kevin

---

[26]   This incident was the second in one year in which Jackson was accused of cursing at a coworker.  (Jackson Dep. exh. 6).  During the first incident, Jackson made some type of undisclosed threat to Ted Thrash, for which Jackson received another unpaid, three-day suspension.  (*Id.*).  Jackson does not allege that this suspension supports his disparate treatment claim.

[27]  Jackson also does not dispute that Smith was suspended for five days without pay for his comment that evening.  (Tribble Decl. ¶ 14, exh. 2).

Varner, a white A Operator, suffered a similar accident and was not similarly disciplined. Varner described his accident as occurring while he, too, was attempting to carve into a wall in the quarry when the wall began to cave in onto the shovel he was operating. (Varner Dep. pg. 101). He failed to pull the shovel out in time to avoid significant damage to it. (*Id*.).

Defendant offers no argument as to why Varner's accident is distinguishable from Jackson's. Thus, the court is without a basis to conclude that Jackson's accident was avoidable but Varner's was not. Upon examining the record, the court finds only one possible explanation for the disparity in treatment. As Jackson attempted to back the bulldozer out from under the wall to avoid being hit by the wall as it fell. (*Id.*). He failed to notice that a rock had fallen in the path of his bulldozer, and continued backward until he struck the rock, causing significant damage to the bulldozer. (Tribble Decl. ¶ 14).

Defendant's investigation into the accident revealed that the lights on the bulldozer were operational, rendering the accident avoidable with the exercise of "proper care." (*Id.*). However, Defendant does not argue that Jackson was disciplined because of this additional damage to the bulldozer. The record indicates that Jackson was suspended for "Failure to follow safety rules. . . . etc. Operating a track dozer next to unstable ground placing himself in danger & resulting in

significant damage to the dozer." (Jackson Dep. exh. 8 (Disciplinary Action Form)). Nothing on this form indicates that Jackson was suspended for hitting a rock and not for allowing the quarry wall to fall on the bulldozer. (*Id.*).  While the court acknowledges Aaron Tribble's Declaration, in which Tribble explains that Jackson was suspended for striking the rock (Tribble Decl. ¶ 14), the court finds that this ambiguity in the evidence offered by Defendant creates at least a question of material fact regarding the reason for Jackson's suspension.  Thus, the court finds that Jackson has pointed to a similarly situated white comparator in Kevin Varner, who engaged in "<u>nearly</u> identical" misconduct but was not suspended for it.[28]

Finally, while Defendant argues that it suspended Jackson for his accident and not because of his race, Jackson's evidence that at least one white employee (Kevin Varner) also suffered an accident but was not disciplined for it presents a genuine question of material fact as to whether Defendant's articulated reason is a pretext for race discrimination.  Thus, Defendant's motion for summary judgment on this claim is due to be **DENIED**.

---

[28] The court acknowledges that Varner's conduct is not "totally identical" to Jackson's because Varner did not strike a rock after pulling away from the collapsing wall, while Jackson did.  However, Jackson need not prove Varner's conduct was "totally identical" to his own to satisfy this element of his claim.  Jackson has, to the court's satisfaction, demonstrated that he and Varner engaged in misconduct that was "nearly identical" and that Varner was not suspended for it and Jackson was.

2.    Retaliation

Jackson first argues that he was retaliated against for filing his EEOC charge in April 2005.  The factual basis for this claim is unclear, as the only adverse employment action that Jackson alleges he suffered is the denial of upgrade work discussed *supra*.  He argues that he was denied upgrade work beginning in November 2006, nineteen months after filing his EEOC charge.

With no further evidence to support this claim, Jackson relies on temporal proximity to establish his prima facie case.  It is well settled, however, that in cases where a plaintiff relies solely on temporal proximity to demonstrate a causal connection, the proximity must be "very close."   *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 1511, 149 L.Ed.2d 509 (2001).   In *Breeden*, the Supreme Court rejected evidence that twenty months' passage between a protected activity and adverse employment action establishes "very close" temporal proximity.   *Id.*, 532 U.S. at 274, 121 S.Ct. at 1511.   Similarly, the passage of nineteenth months in this case demonstrates "no causality at all." *Id.*  Thus, as to the EEOC charge, the court finds that Jackson has not presented a prima facie case of retaliation.

Jackson next alleges that Defendant denied him his share of upgrade work because he complained to it of race discrimination.  On November 8, 2006, Jackson

41

filed a grievance in which he accused Defendant of discriminatorily denying him upgrade work in favor of Camron Ray.  (Pl's exh. 22).  Since then, Jackson argues, Defendant has consistently refused to offer him upgrade work.

This argument is nonsensical on its face.  The only evidence that Defendant favored Ray over Jackson is discussed *supra* (i.e., time sheets indicating that Ray was assigned 223 hours of upgrade work over Jackson's 27.5).  (Pl's exh. 27).  These time sheets are dated from September 2006 to October 2006 and do not relate to any period of time after Jackson filed his grievance in November 2006.  Thus, Jackson cannot establish that Defendant was aware of his grievance when it assigned the upgrade work in September-October 2006.  There is no evidence of any kind that Ray continued receiving more upgrade work than Jackson after Jackson filed his grievance.  Even if he did, the record is clear that Ray was more qualified for upgrade work than Jackson, a point which Jackson does not adequately dispute.  Furthermore, Ray was promoted to A Operator just seven days after Jackson filed his grievance. (Persons Decl. ¶ 8).  Thus, Ray could have been similarly situated to Jackson for only those seven days.  Jackson has wholly failed to adduce evidence that Defendant assigned more upgrade work to Ray in retaliation for Jackson's grievance.

Because Jackson offers no other similarly situated white comparator who received more upgrade work than Jackson, the court is at a loss as to the factual basis

for this claim.[29]   Furthermore, because the record clearly indicates that Ray was more

qualified for upgrade work than Jackson, Jackson has not carried his burden to show

that Ray's assignment of upgrade work and Jackson's grievance are causally

connected.

3.      Hostile Work Environment

Jackson avers that he has suffered from the use of racial slurs and physical

intimidation by his supervisor and various coworkers, such that the alleged

misconduct created a hostile work environment.

Jackson points to the following facts to support this claim:

(1) Aaron Tribble said to Jackson on three occasions, "you'll complain if I buy

a brand new rope and hang you by the tree.   On the tree, you'll complain about the

tree that I hung you from" (Jackson Dep. pp. 28, 53);

(2) Chris Smith said over a CB radio that he wanted to go hunting with Jackson

because he "wanted to kill him a nigger" (*Id.* pp. 33-34), and made vague references

to Jackson's race, such as "your kind of people" and "y'all type of people" (*Id.* pg.

65);

(3) Tribble once said to Jackson, "you cry like a little bitch" (*Id.* pg. 145); and

---

[29]   Indeed, although Jackson cites to various places in the record for his argument that he
was denied upgrade work in favor of "others," all of those citations refer only to Camron Ray as
a similarly situated white comparator.  (Jackson Dep. pp. 74-75, 164; Fulbright Dep. pp. 29-31).

(4) Tribble "don't treat [Jackson] like no man" (*Id.* pg. 111).

Jackson alleges that this conduct continued despite his repeated complaints to Defendant.

Defendant does not dispute that Jackson belongs to a protected group or that he was subject to unwelcome harassment.  Therefore, Jackson has established the first two elements of his prima facie case.

Jackson has not proven that he suffered race-based harassment that is sufficiently severe or pervasive to alter the terms or conditions of his employment or to create a discriminatorily abusive working environment.  Only Tribble's rope comment and Smith's shooting comment are expressly racial.  All of the harrassing conduct occurred sporadically during Jackson's <u>ten-year</u> employment with Defendant.[30]  While Jackson alleges that Defendant has done little or nothing to curb the harassment, he does not dispute that Smith was suspended for five days for his comment, and he admits that Smith has not made any reference to Jackson's "type of people" in several years.  (Tribble Decl. ¶ 19; Jackson Dep. pg. 66).  There is also no indication that Tribble's conduct has continued.

The alleged harassment does not rise to the level of severity or pervasiveness

---

[30]  Jackson has worked under Tribble's direct supervision for at least five of those years. (Persons Decl. ¶ 4; Tribble Decl. ¶ 2).

to satisfy this element of Jackson's claim.  *See EEOC v. FLTVT, LLC*, 2007 WL 3047136, 5-6 (M.D. Fla. 2007); *Buckhanon*, 506 F. Supp. 2d at 962-63, 967 (white supervisors' reference to plaintiffs as "niggers" on three occasions, one of which occurred over a two-way radio, during plaintiffs' two-month employment was not severe as a matter of law, despite other employees' corroboration of the offensive comments, "in that it did not permeate the workplace with discriminatory intimidation"); *Evans v. Pemco Aeroplex, Inc.*, 1998 WL 1048470, 3, 13-14 (N.D. Ala. 1998) (plaintiff "failed to present adequate evidence that the alleged harassment was sufficiently severe or pervasive" where plaintiff saw: (1) a picture of a noose that hung in an office for five months; (2) a noose in the workplace; (3) "KKK" written on a box in the workplace; and (4) a "Nigger Application" that "alluded to numerous offensive racial stereotypes"); *Mitchell v. Carrier Corp.*, 954 F. Supp. 1568, 1573, 1577 (M.D. Ga. 1995) (although explicitly racist graffiti written on bathroom walls for months, rebel flags, and "KKK" drawings in the workplace were "unquestionably humiliating . . . , considering these incidents collectively, they simply are not 'sufficiently severe or pervasive' to create a hostile work environment"), *aff'd*, 108 F.3d 343 (11th Cir. 1997).  *See also Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1521 (11th Cir. 1995) ("[T]he racial slurs allegedly spoken by co-workers had to be so commonplace, overt and denigrating that they created an atmosphere charged with

racial hostility."); *Smith v. Beverly Health & Rehab. Servs., Inc.*, 978 F. Supp. 1116, 1120, 1122 (N.D. Ga. 1997)(to satisfy severe/pervasiveness element, "[i]t is not sufficient that Plaintiff merely highlight a couple of utterances of racial epithets as evidence of a hostile work environment").

Finally, while Jackson testified that he has "lost his dignity," he offers no evidence that the harassment interferes with his job performance.  He argues that "he is not required to have a nervous breakdown" to demonstrate that his job performance has been affected by the alleged harassment.  Nevertheless, Jackson cannot satisfy this element by summarily arguing that he suffered "emotional damage at the hands of Tribble."  Jackson has, therefore, failed to present a prima facie case of hostile work environment.

Because Jackson has not demonstrated a prima facie case of retaliation or hostile work environment, and has failed to present evidence that Defendant's reasons for its conduct are a pretext for retaliation, Defendant is entitled to summary judgment on all of Jackson's retaliation claims.  Jackson's disparate treatment claim based on his suspension for the March 2005 accident, however, survives.  The court now addresses the claims of Plaintiff Demetrius Harvey.

C.   Demetrius Harvey

Harvey entered employment with Defendant on September 11, 2000.  (Persons

Decl. ¶ 3).  He worked in various lower positions before being promoted to C

Operator on June 9, 2003.  (*Id.*).  He works under the supervision of Aaron Tribble.

(Tribble Decl. ¶ 2).

### 1.    Disparate Treatment

Harvey alleges that he has suffered disparate treatment by Defendant's failure

to train him and promote him to advanced positions.  Harvey also claims he was

unfairly reprimanded for workplace accidents for which white employees were not

similarly disciplined.

### a.    Promotions

Harvey argues that he was denied, because of his race, promotions to B

Operator, A Operator, and Leader.

According to Defendant, Harvey cannot present a prima facie case of disparate

treatment with regard to any of these positions, as Harvey admits that he never

applied for them.[31]  (Harvey Dep. 46).  Thus, it is undisputed that Harvey cannot

satisfy the second element of his prima facie case on this claim.[32]

---

[31]  Harvey understands that the first step toward obtaining a new position is to apply for it.
(Harvey Dep. pg. 45).

[32]  Even if Harvey had applied for B Operator and A Operator, it is not clear he would
have been offered those positions due to the apparent scarcity of advancement opportunities in
the quarry.  Harvey argues that Tom Ledin received more advancement opportunities than he did,
but Ledin testified that this was most likely because of his "initiative to do the job," not because
he is white.  (Ledin Dep. pg. 32).  Ledin also explained that he never became a B Operator or an

Instead of responding to this argument, Harvey attempts to change his claim from race-based denial of promotions to race-based denial of upgrade work.  He presents evidence of white Quarry Operators who were assigned upgrade work – Tom Ledin, James Sharbutt, Chris Sturdivant, Brian Ray, Camron Ray, and David Holman (doc. 39 exhs. 15-20) and argues that, while he may not have been as qualified for upgrade work as these individuals, he might have become qualified had he been trained for it.  He requested training three times, but it was never offered to him. (Harvey Dep. pg. 49).

Defendant argues that it has no formal training program, that its quarry operators are trained "on the job" according to the needs of a shift and, therefore, C Operators are trained for and upgraded to B Operator work only when there is an insufficient number of B Operators scheduled a particular shift.[33]  (Tribble Decl. ¶¶ 4, 6-8).  Harvey does not dispute that four of the six white Quarry Operators who receive more upgrade work than he does work during the first shift while he works

---

A Operator because Defendant lacked vacancies for both positions, and he eventually left the quarry to work in another department in Defendant's facility.  (Id. pg. 32-33).  Given that advancement opportunities in the quarry were apparently as scarce for white C Operators as they were for black C Operators, Harvey does not explain why his failure to advance or be assigned upgrade work when advancement opportunities were present was based on his race but Ledin's was not.  Harvey also does not dispute that Marcellus Jackson was promoted from C Operator to B Operator in September 2005, during approximately the same time Harvey wanted to train for that position.  (Persons Decl. ¶ 5).

[33]  Defendant operates with three shifts.  (Tribble Decl. ¶ 5).

the second.  (doc. 39 exhs. 16-18).  Only Tom Ledin and Camron Ray worked the same shift as Harvey and received more upgrade work than Harvey.  (doc. 39 exhs. 15, 19).

As discussed *supra*, Ray received more upgrade work because, as a B Operator, he was more qualified to perform upgrade work than Harvey.  Harvey does not dispute this point, and offers no evidence that Ray's superior qualifications are a pretext for race discrimination. Meanwhile, as already stated, Ledin testified that he believed he received more upgrade work not because he is white, but because of his "initiative to do the job."[34]  (Ledin Dep. pg. 32).

Harvey has not presented a prima facie case of disparate treatment relating to promotions.  He also offers no argument that Defendant's reasons for not promoting or assigning him upgrade work are a pretext for race discrimination.  Therefore, Defendant is entitled to summary judgment on this claim.

b.    Discipline

Harvey also avers that he has been disciplined unfairly because he is black.

---

[34] Indeed, Ledin testified several times that much of his advancement in his job is due to his display of initiative compared with his coworkers, explaining that he often received more overtime and training opportunities and "worked [his] way up the ladder" because of his "outgoing" personality and the fact that he was often the first to volunteer for opportunities to work.  (Ledin Dep. pp. 41-42, 46, 48, 53-54).  Ledin also testified that, on one occasion, he was the first to volunteer to train for A Operator work, and that Marcellus Jackson was the next person to train after him.  (Id. pg. 57).  Harvey offers no explanation for why he was denied upgrade work based on his race when Marcellus Jackson was not.

Specifically, Harvey alleges he was suspended after an accident in February 2005 for which a white employee, Larry Smith, was at fault.[35]  (Harvey Dep. exh. 26).

Defendant argues that it never determined whether Smith was actually at fault for the accident instead of Harvey.  When Harvey filed a grievance to dispute his suspension, Defendant back paid him for his days of missed work.  (*Id.* exh. 27).

Defendant avers that Harvey did not suffer an adverse job action in connection with his suspension because it back paid him for it.  (*Id.*).  The court disagrees, *see supra* (Gary Chapman suffered an adverse employment action in connection with unpaid suspension although he was later back paid).

Nevertheless, Harvey has not pointed to a similarly situated white comparator who engaged in "nearly identical" misconduct and was not suspended for it. The record is clear that Harvey was suspended in February 2005 because he was suspected of causing <u>two</u> accidents on <u>one night</u> --- February 21, 2005--- including the accident for which Larry Smith claimed responsibility and a second accident, which Harvey admits caused the waste of 3,000 gallons of fuel.  (Harvey Dep. exh. 26; Tribble Decl. ¶ 16).  Harvey cannot point to any comparator of any race who was not suspended after being suspected of causing two accidents during a single shift.  Therefore, the

---

[35]  This accident resulted in $30,000 to $40,000 in damage to Defendant's equipment. (Harvey Dep. exhs. 26-27).

50

court finds that Harvey has failed to satisfy this element of his prima facie case. Additionally, Harvey offers no argument to demonstrate pretext. On this basis, Defendant is entitled to summary judgment on this claim.

### 2. Retaliation

Harvey alleges that Defendant retaliated against him for complaining to it of race discrimination and for filing an EEOC charge against it, both in April 2005. (doc. 39 exhs. 23, 24).

While it is clear that Harvey has engaged in statutorily protected activities, it is not clear that he suffered an adverse employment action on which to base his retaliation claim. He characterizes retaliation as "being harassed," and explains that he was harassed by Steve Harbin, who often acted as Harvey's supervisor. (Harvey Dep. pp. 157-166). Harvey testified that

> [I]t seems like every day I come in, I – I'm looking over my shoulder, you know; and he right there; or he's saying something out of the way. The latest incident, he – he jumped up on my haul truck, you know, raising sand, carrying on, you know, all – little old stuff like that. It's – it's – It seems like it's just me basically. I would say out of five days a week, I would say three to four days out of five days a week, constantly, constantly.

(*Id.*, pg. 157-158).

Harvey also claims that Harbin monitored his restroom breaks more diligently than he did the restroom breaks of white Quarry Operators. (*Id.*, pg. 162). Finally,

Harvey alleges that Travis Barrand, Harvey's white coworker, told him that Harbin "wanted to whip his black ass." (*Id.*, pg. 158).

Harbin's alleged harassment is not an adverse employment action. Harvey presents no evidence of a "serious and material change" in the terms or conditions of his employment as a result of the harassment. Indeed, he does not allege that the harassment affected his employment at all. The record is void of evidence that Harvey was unfairly disciplined by Harbin, or that he suffered a decrease in pay or the number of hours he was scheduled to work. Indeed, as previously stated, the record is clear that Leaders have no authority to affect the terms or conditions of their coworkers' employment. (Barker Decl. ¶ 8). There is no evidence that Harbin interfered with Harvey's attempts to advance to higher positions in the quarry. Harvey does not even argue that Harbin's harassment "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *See Burlington*, 548 U.S. at 68, 126 S.Ct. at 2415, discussed *supra*. If he did, the court is not persuaded that Harbin's harassment, which Harvey himself describes as "little old stuff," might have dissuaded a reasonable worker from complaining of race discrimination. (Harvey Dep. pg. 157).

Even if the harassment constitutes an adverse employment action, Harvey has not shown a causal connection between it and his complaint or his EEOC charge.

The record contains no evidence that Harbin did not begin harassing him until he complained or filed his EEOC charge, or that Harbin was aware of his protected conduct when the harassment began.  If the harassment began prior to Harvey's complaint, Harvey does not allege, nor is there evidence to prove, that the harassment worsened following his complaints.  Harvey does not even argue that temporal proximity exists between the events to create a question of fact as to whether the harassment is causally connected to his protected activities.  Thus, Harvey has not presented a prima facie case of retaliation.[36]

3.    Hostile Work Environment

Harvey finally alleges that he suffers from a hostile work environment.  The facts offered to support this claim are as follows:

1.    Harvey heard Aaron Tribble say, "If you put a rope around [Marcellus Jackson's] neck, he'll complain about the tree you hung him from" (Harvey Dep. pg. 138);

2.    Travis Barrand testified that Steve Harbin is "openly hostile" toward Harvey "based on his race," and that Harbin "said something about that Demetrius, I can't stand him.  He said, I swear, if I could just catch him outside of here, I'd beat

---

[36] Defendant does not offer a legitimate, non-discriminatory reason for Harbin's harassment, nor does Harvey argue that such a reason would be a pretext for retaliation.  Thus, the court does not address pretext.

his black ass" (Barrand Dep. pp. 26-27);

3.      Harvey heard Harbin tell Tom Ledin over a CB radio that "the South is going to rise again" (Harvey Dep. pp. 138-142);

4.      Harvey heard Chris Smith say over a CB radio that he wanted to go hunting with Marcellus Jackson because he wanted to "shoot him a nigger." (*Id.* pp. 139, 146-47).

These are the only facts offered to support Harvey's hostile work environment claim.  Although there is no dispute that Harvey belongs to a protected class, these few episodic occurrences cannot be characterized as objectively severe.  The comments were infrequent in the context of Harvey's <u>seven</u>-<u>year</u> employment with Defendant.  None of the comments were physically threatening to Harvey.  There is also no evidence that the comments interfered with Harvey's job performance.  Thus, Harvey has not demonstrated that the harassment was sufficiently severe or pervasive to satisfy this element of his claim.

Finally, Harvey argues that he "reported directly to [Defendant] HR representative that T[r]ibble, the supervisor was saying racial stuff over the CB kinda of stuff on the radio, including the remark of hanging Jackson."  He does not allege that Defendant failed to respond to his complaint, or that Tribble continued to harass him thereafter.  Harvey does not explain any basis for holding Defendant liable for

the alleged harassment.  Thus, Harvey has not presented a prima facie case of hostile work environment.

Because Harvey has not presented a prima facie case of race discrimination, retaliation, or hostile work environment, and has not demonstrated that Defendant's reasons for its conduct are a pretext for discrimination or retaliation, Defendant is entitled to summary judgment on the claims of Demetrius Harvey.

## V.    CONCLUSION

Having considered all disputed facts in the light most favorable to each Plaintiff, the court finds no genuine issue of material fact as to the claims of Gary Chapman or Demetrius Harvey, or of Marcellus Jackson's claims of retaliation or hostile work environment.  Accordingly, Defendant's motions for summary judgment as to Chapman's and Harvey's (docs. 27-28) are due to be **GRANTED**.  Defendant's motion for summary judgment as to Marcellus Jackson is due to be **GRANTED** as to his retaliation and hostile work environment claims and **DENIED** as to his disparate treatment based on discipline claim.

A separate Order will be entered.

**DONE** this the 17th day of June, 2008.

**VIRGINIA EMERSON HOPKINS**
United States District Judge